**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PAULA B. AJISEFINNI, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 11-cv-123(RC) |
| | : | | |
| v. | : | Re Document No.: | 38 |
| | : | | |
| KPMG LLP, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff, a black Nigerian female, was employed as a "senior auditor" by Defendant, KPMG, from September 2001 to June 2008. She was terminated by KPMG effective June, 30, 2008. Plaintiff has filed suit against KPMG on three counts: 1) Discrimination, retaliation, hostile work environment, and wrongful termination on the basis of her race and national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, *et seq.*, 2) violation of the District of Columbia Human Rights Act, D.C. Code §1-2501, *et seq.,* and 3) breach of contract and violation of KPMG's Equal Employment Opportunity Policy. The Defendant has moved for summary judgment on the grounds that Plaintiff has failed to present sufficient facts to permit a reasonable jury to conclude that Plaintiff was the victim of race or national origin discrimination. As explained more fully below, the Court concludes that the Defendant's motion for summary judgment should be granted.

## II.  FACTUAL BACKGROUND

### A.  Structure and Operations of KPMG

Defendant, KPMG is a global network of professional firms providing a variety of accounting services to its clients through its Tax, Audit, and Advisory services practices.  Aff. of Sudammi K. Ranasinghe, ¶ 3, Def.'s Mot. Summ. J., Ex. B., May 17, 2013, ECF No. 38. Within these practices are a number of different groups, including the Management Assurance Services group or Audit group (hereinafter "MAS"), the Business Measurement Process group (hereinafter "BMP"), and the Internal Audit Regulatory and Compliance Services group ("IARCS"). *Id.* at ¶ 4. Services are provided to KPMG clients through projects known as "engagements," and employees who are scheduled on these engagements are often required to travel to the client site location. *Id.* at ¶3.

As part of its performance evaluation process, KPMG requires all employees to complete a self-assessment and to then forward the forms on to the employee's manager. KPMG requires evaluations for specific engagements, an interim year, and for an entire performance year. *Id*. at ¶5.  The purpose of the performance evaluation process is to "provide constructive feedback to the individual employee with suggestions for improvement while also providing them with a performance rating for evaluation purposes on an annual basis." *Id*.  For each engagement, the engagement manager completes the engagement evaluation for the staff, and the performance manager reviews and amalgamates each of the engagement evaluations into interim and year-end performance reviews. Dep. Paula B. Ajisefinni, 36-37, Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. K, July 17, 2013, ECF No. 42.

 KPMG utilizes a "9-Box" performance rating system for assessing the performance of KPMG staff. Dep. Ajisefinni, 41, 78-9. The rating system is divided into three general

categories: a rating of 7-9 indicates that the employee "Needs Improvement," a middle rating of 4-6 indicates that the employee is a "Strong Performer," and finally a rating of 1-3 indicates that the employee is an "Exceptional Performer." *Id.* KPMG evaluates its employees based on their business results, skills, behaviors, and values. *Id.* at 41.

**B. Plaintiff's Employment at KPMG**

**1. Plaintiff's Hire**

Plaintiff began working at KPMG LLP in the Washington, DC office MAS practice on September 24, 2001. Dep. Ajisefinni, 24. On Sept 14, 2001, Plaintiff received a copy of the firm's Equal Employment Opportunity Policy on sexual and other unlawful harassment, and signed an acknowledgment that she received and understood the policy. EEO Policy, Def.'s Mot. Summ. J., Ex. O.

It is undisputed that at the time of Plaintiff's hire, she had passed two parts of the Certified Public Accountant ("CPA") exam. Dep. Ajisefinni, 14. During her time at KPMG, Plaintiff was unable to pass the remaining two portions of the CPA exam and in fact allowed the two portions she had already passed to lapse. *Id.* at 17.

Given her prior work experience, including her time as a senior auditor at Deloitte & Touche, LLP, Resume of Paula Ajisefinni, Pl.'s Opp'n, Ex. G, KPMG's MAS practice hired Plaintiff as a senior associate at a starting annual salary of $60,000. Dep. Ajisefinni, 24-25. Defendant alleges that by the time Plaintiff was terminated in 2008, her yearly compensation was $78,000. Def.'s Mot. Summ. J., at 4. As of 2003, Plaintiff had received no increase in pay. Washington Assurance Salary Review, Pl.'s Surreply in Support of Opp'n, Ex. 1, Oct. 21, 2013, ECF No. 53. Plaintiff concedes, however, that by 2008, her pay had increased. Dep. Ajisefinni, 33.

**2. Plaintiff's Performance Evaluations in the MAS Practice**

Plaintiff was required to complete a self-assessment on her year-end review in 2001 in the MAS practice. In this assessment, Plaintiff wrote that she maintained a good working relationship with client management and properly utilized KPMG technology tools. 2001-2002 Year-End Review, 39, Def.'s Mot. Summ. J., Ex. F. In that self-assessment, Plaintiff also listed that one of her main goals was to pass the remaining portions of the CPA exam by May 2003. *Id.* In her seven years at KPMG, Plaintiff was unable to fully pass the CPA exam. Dep. Ajisefinni, 14. By the time she left KPMG in 2008, the two portions of the exam that Plaintiff had previously passed had also lapsed. *Id.*

By contrast, Plaintiff's performance manager in the MAS practice in 2001, Eric Holt, wrote that Plaintiff "is currently unable to fulfill the role we have asked her to play." 2001-2002 Year-End Review, 45. Specifically, Plaintiff did not have "an internal audit background. As a result, she does not have the…knowledge and experience required to be successful as a senior associate." *Id.* The end-of-year review rated Plaintiff as "Needs Improvement" and made two suggestions for Plaintiff moving forward: 1) move Plaintiff to another group within KPMG where her skills were better suited to the job requirements or 2) demote Plaintiff to an associate position with a corresponding reduction in pay. *Id.*

**3. Plaintiff's Transfer to the BMP Practice and Subsequent Performance Evaluations**

Plaintiff requested and was granted a transfer to the BMP Practice group on October 1, 2002. Dep. Ajisefinni, 48. This group engaged in external audit work for clients and was led in the Mid-Atlantic region by Diane Dudley. *Id.* at 50. In early 2003, Ms. Dudley sat down with Plaintiff to allegedly convey a concern that Plaintiff's work product was not at the level of a

senior associate. Def.'s Mot. Summ. J., at 5. It is undisputed that during the meeting, Ms. Dudley notified Plaintiff that a pay reduction and move to a lower associate level might be in order. Dep. Ajisefinni, 136. Plaintiff declined the demotion and pay decrease. *Id.* Plaintiff further alleges that Ms. Dudley told Plaintiff that "it's not going to work out [at KPMG]" and that the Plaintiff "should go and look for a job in a minority company because [Plaintiff] did not agree" to let Ms. Dudley reduce her pay. *Id.* at 127.

Following this meeting with Ms. Dudley, Plaintiff filed an internal complaint of race discrimination with the KPMG Human Resources Department. Dep. Ajisefinni, 147. During KPMG's investigation into the matter, Plaintiff also alleged that a colleague, Carol Booth,[1] asked Plaintiff at a group dinner whether Nigeria has a university that teaches all Nigerians how to be armed robbers and thieves. Dep. Ajisefinni, 150-151. KPMG's investigation concluded that there was insufficient corroboration of the event. *Id.*

Plaintiff continued to work in the MAS group with the same title and at the same pay level. She continued to work in this group until her termination in 2008. During this time, Plaintiff performance reviews were a mix of "Needs Improvement" and "strong performance." Plaintiff never received an "exceptional performance" from her supervisors. 2002-03 Year End Review, Def.'s Mot. Summ. J., Ex. H; 2003-04 Year End Review, Def.'s Mot. Summ. J., Ex. I; 2004-05 Year End Review, Def.'s Mot. Summ. J., Ex. J. Plaintiff consistently rated herself EP in the self-evaluation portions of these performance reviews. *Id.*

Plaintiff's supervisors consistently found four areas in which Plaintiff's performance was deficient: 1) meeting deadlines, 2) time management, 3) communication with clients and

---

[1] Ms. Ajisefinni states, in her deposition, that Carol Booth was her manager for one brief project in late 2002 or early 2003. Dep. Paula B. Ajisefinni, 167-8, Pl.'s Opp'n to Def.'s Mot. Summ. J., Ex. K, July 17, 2013, ECF No. 42.

supervisors, and 4) lack of knowledge of the audit industry and of KPMG's audit practices. Plaintiff's 2002-03 Year-End review written and compiled by Ms. Ranasinghe, which rated Plaintiff as "Needs Improvement," commented that her self-review contained basic grammatical and spelling mistakes and that Plaintiff needed to complete the CPA exam as soon as possible. The review further noted:

> [Paula] has not replied timely to e-mail requests from her supervisors...all of her other interim evaluations also indicate that Paula was not acting in a senior level capacity. The interim reviews indicate that Paula had trouble meeting the assigned budget, maintaining a professional attitude with the client, and was not prompt with following up on review comments...although she is a BMP senior, she continues to struggle with basic BMP methodology audit activities that are familiar to her peers."

Def.'s Mot. Summ. J., Ex. H, 3.

Plaintiff's 2003-04 Year-End Review, again written and compiled by Ms. Ranasinghe, rated Plaintiff a strong performer "although, compared to the rest of the class she is at the lower end of the strong performer range." The review commended Plaintiff on her improvement in setting goals and turning in review sheets but still found problems with time management and communication with her seniors. Def.'s Mot. Summ. J., Ex. I, 20.

At her deposition, Plaintiff asserted a much different picture of her performance during the 2003-2004 year, and disagreed with "98 percent of what [Ms. Ranasinghe] wrote [in 2003-04]." Dep. Ajisefinni, 84. Plaintiff was unable to offer specific examples of why her 2003-2004 Year-End Review was not accurate, however, merely stating that "[w]hatever she [Ranasinghe] wrote, I disagree with it…" *Id.* In April of 2005, Plaintiff requested that she be assigned a new performance manager, and KPMG agreed to assign Dan Kovlak, the performance manager that she requested. *Id.* 81-85

Plaintiff's 2004-05 Year-End and Interim Reviews again noted deficiencies in the recurring areas noted above. *See generally*, Def.'s Mot. Summ. J., Ex. B-E. Engagement manager Howard Simanoff noted, for example:

> Ms. Ajisefinni failed to properly apply the KPMG methodology to the engagement, which in the end delayed the timing of audit programs and affected planned work. Moreover, Ms. Ajisefinni needed improvement in planning, organizing, and using her time effectively, especially when it came to overall engagement management. Specifically, senior associates, such as Ms. Ajisefinni at the time, are required to update the Audit Checklist and Specific Topics APG periodically throughout the engagement. The Audit Checklist was left uncompleted at the end of Ms. Ajisefinni's tenure on the engagement, as was the CPE documentation. Moreover, Ms. Ajisefinni was unable to provide timely work papers for my review and was untimely in providing feedback to one of the associates on the engagement, and I had expected Ms. Ajisefinni, as a senior associate, to better organize her time to reach the objectives of the audit.

Def.'s Mot. Summ. J., Ex. D, ¶ 9. Engagement manager Sherif Ettefa noted the following issues with Plaintiff's performance:

> Plaintiff failed to complete the audit plan document that summarized KPMG's audit approach from prior audit years so that areas of improvement could be properly identified and new issues arising in the current fiscal year audit could be addressed; Plaintiff's failure to complete the audit plan document created inefficiencies, and forced the engagement manager to complete the assessment himself to ensure that the audit procedures were sufficient in order to reach a proper conclusion on the financial statements; Plaintiff failed to properly account for the client's process changes in her testwork due to her unfamiliarity with the applicable FASB statements…toward the end of the audit, Plaintiff provided the manager with new expected completion dates that were after the dates that had been previously agreed upon during the planning of the audit- the new dates provided by Plaintiff, which were given without any justification, could have delayed issuance of the audit report.

Def.'s Mot. Summ. J., Ex. C, ¶ 9. Similarly, engagement manager Elizabeth Lawson noted:

> Overall, Ms. Ajisefinni did not meet my expectations of how a supervising senior accountant should perform on an engagement. As the reviews set forth, Ms. Ajisefinni did not keep the manager informed of the status of the engagement during interim fieldwork, which caused significant wasted time on the engagement; she was unable to focus her attention on critical audit areas and delegate simple tasks to either the staff accountant or client; deadlines for workpapers review were repeatedly missed; and as a manager, I completed the report, general binder documentation and overall wrap up by myself.

Def.'s Mot. Summ. J., Ex. E, ¶ 8.

In Plaintiff's Year-End 2007 review, Plaintiff's performance was rated as "Needs Improvement." Year-End 2007 Review, 18, Def.'s Mot. Summ. J., Ex. L. The review further noted that although the Plaintiff was performing well in the non-audit assignments, her reviews were lower for her audit engagements. *Id.* Plaintiff disagreed with this Year-End Review and asserted to her performance manager, Dan Kovlak, that the review was "full of trumped-up charges and concocted evidences [sic]." Email Exchange between Dan Kovlak and Paula Ajisefinni, Def.'s Mot. Summ. J., Ex. M.

Plaintiff categorically disagrees with the poor evaluations in her performance reviews. Plaintiff attests that her managers had a good opinion of her work and that her negative reviews were a result of Ms. Dudley's blackmail. Dep. Ajisefinni, 143-145. For example, Plaintiff attests that Mr. Eteffa "had no problem with me. Mr. Ettefa is an Egyptian. Different national origin just like me, so we all know what we are going through…It was the undue influence from Dan Kovlak and Diane Dudley that made Eteffa write whatever it is he wrote." *Id.* at 105. In fact, Plaintiff asserts that all of her poor performance evaluations are due to the undue influence of Ms. Dudley and Mr. Kovlak. She states that "these supervisors have no problem with me…they are doing what Dan Kovlak and Diane Dudley ask them to do…They report to them. If they don't give me a bad evaluation, they either get rid of me or get rid of them." *Id.* at 107. But Plaintiff provides no testimony or documentary evidence suggesting that such undue influence existed.

Plaintiff additionally asserts that Ms. Dudley intercepted anyone who tried to help Plaintiff transfer away from Ms. Dudley. Dep. Ajisefinni, 127. She states for example, "the lady at human resources, Connie Sherman. She wanted to move me out of there a long time ago, but

every single thing that happened Diane Dudley had to approve it." *Id.* at 145. Plaintiff also asserts that KPMG routinely rated white employees "Exceptional Performer," thus leading to greater promotions and pay increases over non-white employees, who were never rated EP. *Id.* at 154. However, when asked specifically to name any white employee who received better evaluations than her, or received a promotion and raise before her, Plaintiff's only response was "all of them." *Id.* at 155. At her deposition, Plaintiff was unable to name a single white employee who received a rating of EP, a promotion, or a raise unfairly and before her. *Id.*

### 4. Plaintiff's Termination

Plaintiff was terminated effective June 30, 2008 and was provided written notice of her termination on June 16, 2008. Aff. Lisa Johnson, ¶ 5, Def. Mot. Summ. J., Ex. N. The Defendant alleges that Plaintiff was included in a Nationwide Reduction in Force ("RIF") in June 2008 – the second of three reductions-in-force for KPMG's Advisory Practice that occurred in 2008. The Defendant asserts that Ms. Ajisefinni was selected for inclusion in the RIF based solely on her continuing performance deficiencies and the numerous poor performance evaluations she had received over the course of her employment with KPMG. *Id.* at ¶ 4.The Advisory practice, where Ms. Ajisefinni was last assigned in 2008, laid off 557 employees in 2008, and since 2008, KPMG has laid off over 2,800 employees nationwide. *Id*. at ¶ 6.

Following notice of her termination, Plaintiff filed a second complaint with KPMG's Human Resources Department, asserting that she was subjected to a discriminatory and hostile work environment and that her termination was based on discriminatory intent. Pl.'s Opp'n, Ex. L-4. KPMG's internal investigation did not find any discrimination. *Id.* Plaintiff subsequently filed this suit against KPMG on three counts: 1) Discrimination, retaliation, hostile work environment, and wrongful termination on the basis of her race and national origin, in violation

of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, *et seq.*, 2) violation of the District of Columbia Human Rights Act, D.C. Code §1-2501, *et seq.,* and 3) breach of contract and violation of KPMG's Equal Employment Opportunity Policy. The Defendant has moved for summary judgment on the ground that Plaintiff has failed to present sufficient facts to permit a reasonable jury to conclude that Plaintiff was the victim of race or national origin discrimination.

## III. LEGAL STANDARD

### A. Summary Judgment Standard

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. S*ee Anderson*, 477 U.S. at 255.

Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "Moreover, the non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather the non-moving party must rely on evidence that would arguably be admissible at trial." *Manuel v. Potter*, 685 F. Supp. 2d 46, 58 (D.D.C. 2010) (internal citations and quotation marks omitted).

## B. Prima Facie Case of Discrimination and the Burden Shifting Standard

To establish a prima facie case of discriminatory discharge, plaintiff ordinarily must show that "1) she belongs to a protected class, 2) she suffered an adverse employment action, and 3) the unfavorable action gives rise to an inference of discrimination." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). A plaintiff may satisfy the third prong of this test by "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class" or, in the context of a discharge claim, showing that she was not terminated for "the two…common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Id.*

The plaintiff may prove her prima facie case through direct evidence, or where, as here, the plaintiff cannot produce direct evidence of discrimination, through the three-part burden-shifting framework laid out in *McDonnell-Douglass Corp v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must initially prove her prima facie case by a preponderance of the evidence. *Id.* at 802. Once the plaintiff succeeds in making this prima facie showing, the burden

of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In the final step under *McDonnell Douglas*, the plaintiff must prove that the employer's proffered explanation is a pretext masking prohibited discrimination. *Burdine*, 450 U.S. at 256.

This Circuit has ruled, however, that "[i]n a Title VII…suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the district court should determine whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of a protected trait or activity. *Id.* Because the Defendant has asserted a non-discriminatory reason for Plaintiff's termination — that Plaintiff was fired as part of the firm-wide Reduction in Force —  this Court will only assess whether Plaintiff's evidence can demonstrate that the Defendant's proffered reason is merely pretext to conceal intentional discrimination.

It is important to note that even if a court believes that the employer made a poor personnel decision, the court may not second-guess that decision "absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982).  In particular, when an employer's proffered defense is that the plaintiff's performance was deficient, as KPMG has argued here, "[i]t is not enough for the plaintiff to show that [the] reason given… is not just, or fair, or sensible. [S]he must show that the explanation given is a phony reason." *Fischbach v. D.C. Dept. of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation

omitted).  "Filing a Title VII action…is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1, 9 (D.D.C. 1996).

Plaintiff also alleges discrimination under the District of Columbia Human Rights Act. D.C. Code §1-2501, *et seq*. The DCHRA prohibits an employer from discharging, failing to promote, or otherwise discriminating against an employee based on race, sex, or for other prohibited reasons such as national origin. *Id.* The legal standard for establishing a discrimination or hostile work environment claim under the Human Rights Act is "substantial[ly] similar[ ]" to the standard under Title VII. *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (applying the same test for discrimination claims under the Human Rights Act as would apply to Title VII allegations due to the "substantial similarity between [Title VII] and the D.C. Human Rights Act"); *see also Knight v. Georgetown Univ.*, 725 A.2d 472, 478 n.5 (D.C. 1999) (noting that the same body of law is used to construe both provisions); *Daka v. Breiner*, 711 A.2d 86, 94 (D.C. 1998) ("[In] deciding issues arising under the [Human Rights Act], [the D.C. Court of Appeals] consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority."); *Regan v. Grill Concepts-D.C., Inc.*, 338 F. Supp. 2d 131, 134 (D.D.C. 2004) ("This Court, too, will consider [the p]laintiff's claims under [the Human Rights Act] utilizing the case law developed for suits brought under Title VII."); *MacIntosh v. Bldg. Owners & Mgrs. Ass'n Int'l*, 310 F. Supp. 2d 240, 244 (D.D.C. 2004) (noting that in analyzing a claim of employment discrimination under the Human Rights Act, courts look to Title VII and its jurisprudence).

Moreover, "in considering claims of discrimination under the DCHRA, [courts] employ the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Hollins v. Fed. Nat. Mortg.*

*Ass'n*, 760 A.2d 563, 571 (D.C. 2000); *see also McFarland v. George Washington Univ.*, 935

A.2d 337, 346 (D.C. 2007); *Atlantic Richfield Co. v. District of Columbia Commission on*

*Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986). Because Plaintiff alleges the same facts and

violations under both Title VII and the DCHRA, and because both statutes apply the same legal

standard and burden-shifting framework, the Court will analyze Plaintiff's claims under both

statutes simultaneously.


# IV.  ANALYSIS

## A.  Discriminatory Discharge and Disparate Treatment

The Defendant asserts a non-discriminatory reason for Plaintiff's termination — that the

Plaintiff failed to perform her job at an acceptable level and was thus included in the firm-wide

2008 Reduction in Force.  KPMG's asserted defense falls within one of the two "common

legitimate reasons for discharge: performance below the employer's legitimate expectations,"

*Leavitt*, 407 F.3d at 412, and thus shifts the burden to the Plaintiff, who must produce sufficient

evidence to demonstrate that the Defendant's proffered reason is mere pretext for discrimination.

*Brady*, 520 F.3d at 494.

Plaintiff's managers explained that over the course of Plaintiff's seven years at the

company, she received a significant number of negative performance reviews. Def's Mot. Summ.

J., Exs. B-J, May 17, 2013, ECF No. 38. In particular, Plaintiff's managers fault plaintiff for: 1) a

failure to complete assigned tasks in a timely or complete manner, Def's Mot. Summ. J., Exs. C,

D, J; 2) a lack of communication with her supervisors and with the clients, including untimely

replies to emails and a failure to inform her supervisor of client communication issues, *id*., Exs.

B, E, I; 3) poor time management skills, *id.*, Exs. B, C, D, F, I, H; and, 4) a lack of the requisite

knowledge necessary for a senior associate, and a failure to make any progress in acquiring that knowledge. *Id.*, Exs. B, C, D, F, G, H, I. Overall, the plaintiff was consistently rated by her managers as "Needing Improvement" or as a "low-end Strong Performer." Ms. Ajisefinni never received the highest group of ratings at the firm, "Exceptional Performance." Dep. Ajisifenni, 117, Pl.'s Opp'n Summ. J., Ex. K, March 20, 2013.

Plaintiff responds to these evaluations by relying on her own self-serving statements and perceptions of her work performance. She alleges that she was generally qualified for the senior associate position and performed in a competent manner. She does not dispute, however, any of the facts or specific events detailed in the Defendant's evaluation reports, or offer evidence to the contrary. *See generally,* Dep. Ajisifenni. As a result, most of the material facts in the performance reviews, which the Defendant allegedly relied upon in terminating Ms. Ajisefinni, remain unrebutted.

Moreover, even if the Plaintiff is correct in claiming that her performance was well appreciated and of high quality, this is not a material fact for establishing pretext. "[P]laintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant." *Smith v. Chamber of Commerce of the U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986); *see also Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (2000) (finding no genuine issue of material fact where plaintiff provided no evidence other than her own self-serving statement that she was a hard worker), *abrogated on other grounds by Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006); *Saunders v. DiMario*, No. Civ. A.97-1002 (PLF), 1998 WL 525798 at *4 (D.D.C. August 14, 1998) ("Plaintiff has otherwise offered the type of self-serving allegations that are simply insufficient to establish pretext.").

Thus, Plaintiff's opinion that she was competent and performed well in her position is simply not relevant.

Plaintiff does offer some objective evidence of positive performance, outside of her own opinion, in the form of positive performance evaluations written by managers outside of the D.C. area. *See* Pl.'s Opp'n Summ. J., Ex. P, July 17, 2013, ECF No. 42. In these evaluations, Ms. Ajisefinni's supervisors found her to be hardworking, taking leadership of her projects and working overtime to complete the projects in a timely manner. *Id.* Although these positive evaluations indirectly contradict some of Ms. Ajisefinni's negative evaluations, they are still insufficient to raise a dispute of material fact. In order for the dispute to be material, the evaluations must be so contradictory as to persuade a reasonable finder of fact that the Plaintiff's evaluations within the D.C. office were in fact false and were a pretext for discriminatory termination. The core inquiry is not whether "reasonable jurors might…find some of the criticisms of plaintiff's performance overly harsh, but whether reasonable jurors could conclude that plaintiff's termination was motivated by a discriminatory animus." *Waterhouse*, 124 F. Supp. 2d at 11.

These evaluations are not so contradictory as to give rise to such an inference. First, these evaluations have little probative value as they only evaluated Ms. Ajisefinni on short, discrete projects, while she was involved in work well below someone of her seniority. *See, e.g.,* Performance Evaluation by Karen Page, Pl.'s Opp'n Summ. J., Ex. P (noting that Paula's work assignment was "brief and discrete" and it seemed that Paula's "work experience qualified her for more complicated assignments"). Moreover, even these positive evaluations repeated many of the same criticisms seen in Ms. Ajisefinni's D.C. based evaluations, including her failure to communicate with her supervisors and a lack of requisite knowledge given her position at the

firm. *Id*. A couple of partially positive performance reviews simply cannot demonstrate pretext, especially when the record contains numerous negative performance evaluations, written by several different managers, and spanning the full range of Plaintiff's employment at KPMG.[2]

Plaintiff asserts that the Defendant has offered two separate justifications for Plaintiff's termination, thus evidencing pretext: the Defendant at first claims that Plaintiff was fired as a part of the firm-wide Reduction-in-Force, but later claims she was fired for her poor performance. Pl.'s Opp'n, 19. "[E]vidence of alternate justifications tends to undercut the proffered explanation" and may demonstrate pretext. *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 68 (D.D.C. 2006) (inferring a shifting rationale where the plaintiff's supervisor mentioned that plaintiff was replaced because of her job performance, yet, during a deposition, the plaintiff's supervisor stated that he had no concerns about the plaintiff's work performance). However, refinement of a previously proffered explanation does not rise to the level of a shifting-rationale, and is insufficient to demonstrate pretext. *See, e.g., Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 33 (D.D.C. 2009) (finding no shifting-rationale when defense witness was unable to remember the *number* of complaints received about plaintiff, because this testimony was not contradictory to the defendant's proffered justification: poor performance evaluations); *Jones v. Bernanke*, 493 F. Supp. 2d 18, 33-34 (D.D.C. 2007) (finding insufficient evidence of shifting-rationales when defendant praised plaintiff's communication in his IT specialty but criticized plaintiff for an inability to explain things in "non-technical" terms).

Defendant has consistently stated that Plaintiff was chosen for the RIF solely because of her poor performance at the firm. Def.'s Mot. Summ. J., 10 (citing Aff. Lisa Johnson, ¶4, Ex. N);

---

[2] It is important to note that Plaintiff was terminated as part of the firm-wide reduction in force. Thus, the issue is not whether she had any positive attributes, but how her performance compared to her co-workers who were not chosen to be included in the reduction.

Def.'s Reply to Pl.'s Opp'n, 6, n.4, Aug. 8, 2013, ECF No. 45. Defendant's proffered justifications are not contradictory, as they were in *Kalinoski.* Rather, they are merely refinements upon their decision making process. As a result, "plaintiff has not demonstrated the type of shifting-rationale, or an after-the-fact statement that is required to establish that the defendant's non-discriminatory reason is a pretext for discrimination." *Jones v. Bernanke*, 493 F. Supp. 2d at 33.

In addition to her claim of discriminatory discharge, Plaintiff argues that she was treated disparately from her white co-workers while at KPMG. Plaintiff alleges that she was purposefully denied raises and was never rated EP, even though similarly situated white employees often were. These assertions are unsupported by objective evidence in the record. In fact, when pressed to name even one similarly situated white employee who was given a raise or promoted before her, Ms. Ajisefinni was unable to recall a single name. Dep. Ajisefinni, 153-157. When plaintiff was asked to name any white senior associate who received higher compensation than her, or white employees who received superior evaluations to her, Ms. Ajisefinni was only able to say "all of them." *Id.* These conclusory assertions cannot satisfy the *Celotex* standard for summary judgments, which requires the non-movant to identify *specific* facts in the record. 477 U.S. at 323 (emphasis added).

The only other evidence Ms. Ajisefinni offers in support of her claims of discrimination are the affidavits of four individuals: her two parents, a friend who was never employed by KPMG, and an anonymous former employee of KPMG. Pl.'s Opp'n Summ. J., Exs. I-J, July 17, 2013, ECF No. 42. These affidavits reiterate that Ms. Ajisefinni felt discriminated at KPMG. *Id.* However, none of these individuals have any first-hand knowledge of Ms. Ajisefinni's interactions at KPMG. They only know what Ms. Ajisefinni told them.

It is questionable whether the affidavits executed by Plaintiff's parents and Plaintiff's non-KPMG friend can overcome the hearsay bar to be admitted into evidence. *See Bhatnagar v. Sunrise Senior Living, Inc.,* 935 F. Supp. 2d 1, 8 (D.D.C 2013) (excluding much of plaintiff's evidence at the summary judgment stage due to evidentiary concerns such as hearsay). Nevertheless, even if the Court were to consider the full weight of this evidence, the affidavits do no more to advance Plaintiff's claim of discrimination than Plaintiff's own testimony. After all, these witnesses have no additional knowledge of KPMG's decision to terminate Ms. Ajisefinni, or of her treatment at the firm. They merely restate, in some cases verbatim, what they have heard from Plaintiff herself. *Compare* Aff. Mrs. Ajisefinni, Pl.'s Opp'n, Ex. J *with* Aff. Mr. Ajisefinni, Pl.'s Opp'n, Ex. J-1. As such, these affidavits unsurprisingly provide no additional circumstantial evidence of the Plaintiff's alleged discriminatory treatment at the firm, or that Defendant's stated reason for terminating Plaintiff was mere pretext to cover up discrimination. *Id.*

The affidavit of the anonymous former KPMG employee faces similar concerns. At the outset, "we would have thought it unnecessary to point out, *inter alia,* that Rule 56(c)'s requirement that affidavits opposing summary judgment 'set forth specific facts' is not satisfied by an affiant whose identity is not disclosed…" *Patterson v. County of Oneida*, 375 F.3d 206, 223 (2d. Cir. 2004). Moreover, the anonymous employee's statements do not speak to Plaintiff's experience at KPMG. The affiant never indicates whether he knew Ms. Ajisefinni personally, or whether he even worked in the same office as Ms. Ajisefinni. Even if the Court accepts the affiant's sweeping generalizations regarding KPMG's treatment of individuals of black descent, these statements provide no additional insight into the treatment of Ms. Ajisefinni by the specific supervisors she alleged discriminated against her. *See* Aff. of Anonymous Employee, Pl.'s

Opp'n, Ex. J-2. As a result, this anonymous affidavit does no more to advance Plaintiff's claim of discriminatory treatment than her own self-serving statements or the previously discussed affidavits.

Finally, plaintiff argues that the derogatory statements made by Ms. Dudley are evidence of both pretext and discriminatory intent in her performance evaluations and termination. Plaintiff claims that Ms. Dudley 1) coerced other managers into giving plaintiff bad performance evaluations, and 2) harassed her by asking her to take a 25% pay reduction and to "go look for a job at a minority black accounting firm," Dep. Ajisefinni, 136-138.

Plaintiff claims that her managers universally appreciated her work, and that they specifically told Plaintiff that Ms. Dudley coerced them to falsify Plaintiff's performance reviews, Dep. Ajisefinni, 126-8. Yet she is unable to name even one specific manager who has communicated this to her. *Id.* 129-133. When asked to identify a specific manager, her only response was "all of them." *Id.* Moreover, many of the managers who were allegedly blackmailed into writing poor performance reviews have subsequently submitted affidavits under oath and pain of perjury confirming the truth of their performance evaluations. Def.'s Mot. Summ. J., Exs. B-E. Outside of her own conclusory, subjective, and uncorroborated belief of Ms. Dudley's motivations, Plaintiff offers no evidence of blackmail or coercion.

Similarly, Plaintiff's claims of racial epithets and of discrimination generally were twice investigated by KPMG's Human Resources Department and found to be unsubstantiated. Dep. Ajisefinni, 151-2, Pl.'s Opp'n, Ex. L-4. Neither KPMG's internal investigation nor this suit's discovery process has unearthed a single employee in the firm who can corroborate Plaintiff's claim of discrimination. This is despite Plaintiff's assertion that KPMG's alleged

institutionalized racial discrimination is a fact widely recognized and often discussed among the employees. Dep. Ajisefinni, 156-7.

Even if the Court assumes that Plaintiff's claims of racial epithets are true for summary judgment purposes, these remarks are insufficient proof of discrimination, as the remarks are isolated incidents and contain no "nexus between the stray remark and the adverse employment decision." *See Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C. 1997); *see also Beeck v. Fed. Exp. Corp.*, 81 F. Supp. 2d 48, 53-4 (D.C. Cir. 2000) ("Direct evidence does not include stray remarks in the workplace, even if made by decision-makers, where the remarks are unrelated to the decisional process itself." ). A "single remark…albeit insensitive, is insubstantial to establish direct evidence of racial or national origin discrimination on the part of the defendant." *Kalekiristos*, 958 F. Supp. at 665. In order for Plaintiff to establish discriminatory animus in an adverse employment decision (here that is Plaintiff's termination) there must be a clear nexus between the "stray workplace remark[ ]" and the adverse action. *Id.* at 666. Such a nexus can be shown if the remark was made by an individual with the power to influence Plaintiff's termination, and the remark was temporally close in time to the termination. *Lucas v. Paige*, 435 F. Supp. 2d 165, 170-171 (D.D.C. 2006) (citing *Hanan v. Corso*, No. 95-CV-292, 199 WL 320858, at *15 (D.D.C. May 18, 1999).

Carol Booth was Ms. Ajiefinni's manager for only one brief assignment in 2003. Dep. Ajisefinni, 167-8. Given that Ms. Booth's interaction with Plaintiff was limited, isolated, and temporally removed from the termination decision, any influence Ms. Booth may have had over the termination decision would be miniscule. At most she may have written or contributed to a poor evaluation of Plaintiff's work. But this evaluation, assuming such an evaluation even exists, would be merely one of many evaluations of Plaintiff's work over her time at KPMG. Because

there is no clear nexus between Ms. Booth's single remark at an offsite dinner and the Plaintiff's termination five years later, this statement constitutes a stray remark and cannot evidence pretext.

Ms. Dudley, on the other hand, was Ms. Ajisefinni's supervisor and did contribute to the Defendant's decision to terminate Ms. Ajisefinni. Still, Ms. Dudley's insensitive remark was made in early 2003, more than five years before Plaintiff was terminated. Even if Ms. Dudley's remark evidenced Ms. Dudley's state of mind in 2003, there is no evidence that this mindset influenced Plaintiff's termination decision. It was only after Ms. Ajisefinni received poor evaluations from numerous managers, over the course of five years, that Ms. Dudley finally recommended Plaintiff for inclusion in the reduction in force. Moreover, Ms. Dudley did not single out Ms. Ajisefinni for termination. In 2005, Ms. Dudley asked her senior managers to identify the lowest performers at the company. *See* email exchange between Diane Dudley, Michael Lippert, and Brian Seney, 51-52, Oct.-Dec. 2005, Pl.'s Surreply, ECF No. 53. Ms. Ajisefinni was identified by her managers as a bottom 10% performer. *Id.* Thus, even if Ms. Dudley made an insensitive, racially-tinged remark in 2003, it was too attenuated from the adverse employment action, both in time and in the actual decision-making process, to establish pretext.

In sum, plaintiff has not set forth sufficient evidence for a reasonable jury to conclude that the Defendants' proffered reasons for her termination are false or pretextual, or that her termination was the result of discrimination. Plaintiff further has not set forth sufficient evidence that she was treated disparately from others in the firm, much less that any disparate treatment was based on discrimination. Accordingly, summary judgment is awarded as to the discriminatory discharge and discriminatory treatment claims.

## B. Retaliation

Next, Plaintiff asserts that the Defendant retaliated against her for engaging in protected activities — that is to say, Plaintiff contends that KPMG fired her for reporting discrimination to KPMG's Human Resources Department on a consistent basis. Pl.'s Am. Compl., ¶15; Pl.'s Opp'n Summ. J., 20-22. "Title VII's anti-retaliation provision prohibits an employer from discriminat[ing] against an employee because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Manuel v. Potter*, 685 F. Supp. 2d 46, 65 (D.D.C. 2010) (citing 42 U.S.C. §2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).

To establish a prima facie case of retaliation, the plaintiff must demonstrate that: 1) she engaged in a statutorily protected activity; 2) the employer took an adverse personnel action; and, 3) a causal connection existed between the two. *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). The Court entirely skips the first prong as it is undisputed that Plaintiff engaged in a statutorily protected activity (reporting discrimination to KPMG's HR office and to the EEOC). It is also undisputed that Plaintiff suffered at least one adverse personnel action, her termination at the firm. The Court pauses here to discuss whether KPMG's financial audit of Ms. Ajisefinni can also constitute an adverse employment action.

KPMG selected Plaintiff for a financial audit in late 2007. Pl.'s Opp'n, 9; Ex. M. The audit was completed by April 2008 and found no issues with Plaintiff's reporting. Pl.'s Opp'n, Ex. M. Plaintiff was terminated two months later. Plaintiff alleges that she was singled out for a financial audit by her supervisor Mr. Kovlak, who submitted her name in order to set her up for termination. Pl.'s Opp'n, 9. Plaintiff further alleges that upon inquiry, she was told that this audit process was normally reserved for KPMG partners and that Plaintiff was the only Supervising

Senior Auditor selected for this audit in the entire KPMG Mid-Atlantic region. *Id.* Unfortunately, KPMG offers no explanation for this audit, leaving the Court to guess whether KPMG harbored a retaliatory motive. *Cf. Washburn v. Harvey*, 504 F.3d 505, 511 (5th Cir. 2007) (finding no dispute of material fact because the Defendant presented evidence that the audit was "part of a non-retaliatory district-wide audit of all employees who, like Washburn, worked from home").

The audit is only actionable if it constitutes a materially adverse action under the retaliation provision of Title VII. "The antiretaliation provision protects an individual…from retaliation that produces an injury or harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). For a harm to be considered actionable retaliation, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68-69 (internal quotations omitted). An "administrative investigation can constitute [a] materially adverse action[ ]" but only if the employee's "work assignments or promotional opportunities were affected by the…investigation." *Bridgeforth v. Salazar*, 831 F. Supp. 2d 132, 145 (D.D.C. 2011). The Plaintiff must prove that the investigation "posed an *objective* harm to [the employee's] reputation or prospects." *Id; see also, Rattigan v. Holder*, 604 F. Supp. 2d 33, 54 (D.D.C. 2009).

The financial audit does not meet this standard. There is no evidence that the audit affected Plaintiff's reputation at the firm — the audit letter sent to the Plaintiff was marked confidential, nor is there any indication that Plaintiff's co-workers knew of the audit from other sources. Pl.'s Opp'n, Ex. M. Similarly, the audit by itself could not harm the Plaintiff's prospects at the firm — she passed the audit with flying colors.

This only leaves the issue of Plaintiff's termination, and whether KPMG terminated Plaintiff in retaliation for reporting racial and national origin discrimination to KPMG's Human Resources Department. KPMG asserts a non-retaliatory justification for the adverse personnel action — namely that the Plaintiff was terminated as a part of the company-wide Reduction in Force, for which she was selected due to her poor performance. Def.'s Mot. Summ. J., 19-20. Thus, pursuant to *Brady*, this Court need only examine whether the Plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason" was in fact pretext for retaliation. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (2008); *see also Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (explaining that the prima-facie case is largely irrelevant once an employer has asserted a non-discriminatory reason for its adverse employment action); *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008) (applying *Brady* in the retaliation context). For the reasons set forth below, Plaintiff has failed to show that retaliatory animus animated her termination.

First, there is only a weak causal connection, if any, between Plaintiff's protected activity and her termination. A causal connection can be established by showing that "the employer had knowledge of the employee's protected activity, and…the adverse personnel action took place shortly after that activity." *Pardo-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)). This Circuit has held however that when an inference of causation is premised on temporal proximity alone, even an eight to nine month gap between the protected activity and the adverse employment action is too great to establish an inference of causation. *See Mayers v. Laborers' Health & Food Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-4 (2001) (per curiam) (citing with approval circuit cases rejecting temporal

proximity of three and four months as evidence of causation); *Ball v. Tanou*, 133 F. Supp. 2d 84, 92 (D.D.C. 2001) (finding a sixteen month time lag to be too great to establish retaliation); *Saunders v. DiMario,* No. Civ. A. 97-1002 (PLF) 1998 WL 525798, at *5 (D.D.C. August 14, 1998) ("The greater the time that elapses between the protected activity and the alleged acts of retaliation, however, the more difficult it is to demonstrate any causal connection and, absent any other evidence, where the gap is sufficiently great it is appropriate to grant judgment for the defendant as a matter of law."); *Garrett v. Lujan,* 799 F. Supp. 198, 202 (D.D.C. 1992) (same for a one year time lag).

Plaintiff only identifies two instances in which she engages in a protected activity: the two complaints she lodged with KPMG's Human Resources Manager between 2003 and 2008. Pl.'s Am. Compl., ¶ 9; Pl.'s Opp'n, 21-22. The first complaint was filed in January or February 2003, after plaintiff was asked by Ms. Dudley to take a 25% pay reduction. Dep. Ajisefinni, 147-9. This complaint was filed five years before Plaintiff was notified of her termination on June 16, 2008, thus failing to raise an inference of retaliation. Plaintiff's second complaint was lodged on June 24, 2008, eight days after Plaintiff was informed of Defendant's decision to terminate her employment. Pl.'s Opp'n Summ. J., Ex. L-4. Because Plaintiff filed this complaint only after she was informed of her termination, this too cannot form the basis for a claim of retaliation. *See, e.g.*, *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 52 (D.D.C. 2007) ("To establish a causal connection, the adverse connection must take place *after* the employee's protected activity." (citing *Holcomb v. Powell,* 433 F.3d 889, 903 (D.C. Cir. 2006)) (emphasis in original).

Moreover, even if Plaintiff could raise an inference of causation due to temporal proximity, she must still show that the Defendant's proffered justification is pretext for retaliation. *See Brady*, 520 F.3d at 494. Plaintiff relies on the same evidence presented in the

discrimination section to prove her retaliation claim. Pl.'s Opp'n Summ. J., 21-22. As plaintiff states in her opposition, "Plaintiff['s] protected activity was reporting discrimination to…Defendant's Human Resources on a consistent basis. The adverse action was Plaintiff's termination and the basis for the termination can be inferred to be retaliation for complaining about discrimination….The facts supporting the claim for retaliation and discrimination were previously discussed in this document…." *Id.*

For the same reasons already discussed however, Plaintiff's evidence is insufficient to show that the Defendant's proffered reasons for termination were pretext for unlawful retaliation. Numerous performance evaluations, spanning over the course of her employment with KPMG, found that Ms. Ajisefinni lacked the requisite skills and knowledge necessary for employees at the senior associate level, that she failed to communicate with her supervisors, and that she failed to complete her assignments in a timely and efficient manner. Def.'s Mot. Summ. J., Exs. B-I. And Plaintiff provides no evidence, aside from her own self-serving and uncorroborated testimony, that the poor evaluations were fabricated by Ms. Dudley to retaliate against Plaintiff for filing an HR complaint. To the contrary, Plaintiff received weak performance evaluations throughout her tenure at KPMG, both before and after she engaged in protected activities.

What little additional evidence Plaintiff has asserted relates to the alleged race discrimination, not to retaliation. For example, while the racially tinged sentiments allegedly uttered by Ms. Dudley or Ms. Booth may provide some evidence of discrimination and a hostile work environment, they could not be indicative of a retaliatory motive, as they were uttered before Plaintiff even lodged her first discrimination complaint with KPMG's Human Resources Department. *See, e.g., Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 52 (D.D.C. 2007) ("To establish a causal connection, the adverse connection must take place *after* the employee's

protected activity." (citing *Holcomb v. Powell,* 433 F.3d 889, 903 (D.C. Cir. 2006)) (emphasis in original).

In sum, plaintiff has not set forth sufficient evidence for a reasonable jury to conclude that Defendants' proffered reasons for her termination are false or pretextual, or that her termination was the result of retaliation. And Plaintiff has not set forth sufficient evidence to show a causal connection between her protected activity and her termination. Accordingly, summary judgment is awarded as to the retaliation claim.

## C. Hostile Work Environment

Plaintiff alleges that she was subjected to a hostile work environment until she was terminated. Pl.'s Am. Compl, ¶8, Sept. 9, 2011, ECF No. 10. Plaintiff asserts she was subject to a hostile work environment in the following ways: 1) she was not given "bonuses or merit increases on a consistent basis, even though she had done a good job"; 2) she was "retaliated against;" 3) her pay was indirectly taken from her; 4) she was intentionally given bad performance evaluations so as to keep her from being promoted or given appropriate compensations "like her white American co-workers"; and 5) her evaluations included stereotypical anti-African statements. Pl.'s Opp'n, 8. The Court will address each of these allegations in turn.

The Supreme Court held, in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), that harassment so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment" violates Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotations omitted). "In order to be actionable under the statute, a[n]…objectionable environment must be both objectively and subjectively offensive,

one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). To determine whether an environment is objectively abusive, courts should consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[I]solated incidents…will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. at 788 (1998).

The standards for judging a hostile work environment claim are sufficiently demanding to ensure that Title VII does not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 82 (1998). Thus, not everything that makes an employee unhappy would necessarily be part of a hostile work environment claim. Second, a "plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . because of' the employee's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188-89 (D.D.C. 2012) (quoting *Oncale*, 523 U.S. at 81). "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." *Id.* (citing *Lewis v. D.C.*, 653 F. Supp. 2d 64, 80 (D.D.C. 2009)).

The Plaintiff relies on the same facts in her hostile work environment claim as in her discriminatory discharge and retaliation claims. However, these facts suffer from the same evidentiary deficiencies. As already noted, at the summary judgment stage the Court is required to analyze all underlying facts and inferences in the light most favorable to the non-movant,

which here is the Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Still, the non-movant must point to *specific facts in the record* and cannot merely rely upon conclusory assertions offered without offering any evidentiary support. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Thus, as with Plaintiff's discrimination claim, these allegations can only be considered as a part of a hostile work environment claim if Plaintiff can support her allegations with specific facts evidencing discriminatory animus.  But again, Plaintiff cannot point to specific facts in the record evidencing a discriminatory mindset, whether based on race, national origin, or retaliation. As a result, these events cannot be included when analyzing whether Plaintiff has met the threshold for her hostile work environment claim. *Peters*, 873 F. Supp. 2d at 188-89.

Plaintiff first claims that she was not awarded bonuses or merit increases, even though she had "done a good job."   Although Plaintiff claims that other white co-workers were compensated more favorably than she was, Plaintiff has not named a single, similarly situated white employee who benefited. *See infra,* Part IV. A.  Moreover, Plaintiff concedes that she was given raises and offers no evidence to counter Defendant's claim that Plaintiff was the highest paid senior associate at her level. Dep. Ajisefinni, 157; Washington Assurance Salary Review, Pl.'s Surreply, Ex. 1. Similarly, although Plaintiff claims she was intentionally given poor performance evaluations, she offers no objective evidence that these evaluations were motivated by discriminatory animus, or written with the purpose to threaten or humiliate Plaintiff. *See infra,* Part IV. A. The Court reiterates that Plaintiff offers only her own self-serving, conclusory, and uncorroborated statements in support of discriminatory animus, which are insufficient to overcome summary judgment. *Greene*, 164 F.3d at 675.

Plaintiff next argues that her pay was systematically deducted without her prior approval, which she claims was due to her poor evaluations. Dep. Ajisefinni, 161. Yet again she fails to identify any specific facts in the record to indicate that KPMG acted with discriminatory animus and fails to link her deduction in pay to her poor evaluations. *See Greene*, 164 F.3d at 675. The record identifies only one instance where the Plaintiff's pay was deducted: when Plaintiff apparently rented a car and charged it to the firm without the authorization to do so. Pl.'s Opp'n, Ex. L-5. Plaintiff has not provided any information disputing or rebutting KPMG's assertion that these charges were unauthorized. Nor does Plaintiff provide information of other incidents in which her pay was deducted without her notice. It therefore seems that Plaintiff's pay was not deducted as a matter of practice, but rather as an isolated incident done legitimately for a non-discriminatory and non-retaliatory reason — in response to an unauthorized purchase. *See generally Faragher*, 524 U.S. at 788.

Moreover, Plaintiff does not allege a single fact that links her deduction in pay to discriminatory animus based on her race, national origin, or having engaged in a protected activity. *See Peters*, 873 F. Supp. 2d at 188-89 (noting that only those personnel decisions that can be linked to Plaintiff's protected status can form the basis of a hostile work environment claim). Plaintiff does not argue that her pay was deducted because she is black, Nigerian, or complained of discrimination. She only claims that her pay was deducted as punishment for her poor evaluations, which she claims were falsified due to discriminatory animus. But Plaintiff fails to link the one instance her pay was deducted to her performance evaluations. Because Plaintiff provides no evidence that these pay deductions occurred on a systematic basis, much less that the deductions can be linked to a discriminatory or retaliatory animus, these allegations

too cannot be included in analyzing a hostile work environment claim. *Peters* 873 F. Supp. 2d at 188-89.

The acts and events analyzed above make up the bulk of Plaintiff's hostile work environment claim. None of the alleged conduct, however, can meet Title VII's basic threshold: that "the conduct at issue was not merely tinged with offensive…connotations, but actually constituted discrimination…because of the employee's protected status." *Peters* 873 F. Supp. 2d at 188-89 (quotation marks omitted). Only one type of alleged hostile conduct has yet to be considered: racially stereotypical statements allegedly made in Plaintiff's evaluations. Although Plaintiff alleges this as recurring conduct, she identifies only one stereotypical statement — a comment that describes Plaintiff as being "too slow." Dep. Ajisefinni, 140-2. At the outset, the Court is skeptical that this comment is intended as a derogatory remark based on Plaintiff's skin color or national origin. After all, Plaintiff was frequently criticized for responding late to her supervisors' phone calls and e-mails, and for regularly missing her deadlines.

Nevertheless, the Court considers the full weight of this allegedly racially stereotypical comment, along with three other events not alleged by the Plaintiff, but which could still potentially form the basis of a hostile work environment claim: the racially tinged statements made by Ms. Booth and Ms. Dudley, *See infra,* Part IV. A., and the financial audit that Plaintiff was selected for in late 2007, Pl.'s Opp'n, Ex. M. Plaintiff alleges she was singled out for this audit by her supervisor Dan Kovlak, even though KPMG did not generally audit their senior associates. Pl.'s Opp'n, 9.

Even taking these events together, and assuming that they were intended to harass the Plaintiff, the conduct is still not severe or pervasive enough to constitute an alteration of the Plaintiff's employment conditions. *See, e.g., Faragher*, 524 U.S. at 788; *Harris*, 510 U.S. at 23;

*Hussain v. Nicholson*, 435 F.3d 359, 366-7 (D.C. Cir. 2006) (finding that although plaintiff's work environment was "hardly ideal," no reasonable jury could find it an "abusive" working environment where plaintiff was denied a promotion, denied medical leave, given poor performance evaluations, and threatened with termination); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C 2007) (finding that five discrete acts over a two-year period as well as infrequent inappropriate comments and staring do not reach the level of "severe" or "extremely serious conduct" for a claim of hostile work environment); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (finding that three isolated incidents are not sufficiently severe in quantity or quality to support a hostile work environment, even when these incidents included inappropriate touching).

The events at issue here still only represent four isolated events of alleged harassment over the course of Plaintiff's seven years at KPMG. Moreover, the racially tinged comments made by Ms. Booth and Ms. Dudley are separated from the financial audit by five years.[3] Even combined, four isolated instances are insufficiently severe or pervasive to form the basis of a hostile work environment claim.

In sum, Plaintiff cannot show that she faced frequent discriminatory or retaliatory conduct, of such an extreme and severe nature that the conduct unreasonably interfered with the Plaintiff's

---

[3] The Court notes that the racially tinged statements allegedly uttered by Ms. Dudley and Ms. Booth occurred *prior to* Plaintiff's first complaint to KPMG's Human Resources Department. As a result, the comments cannot have been made with a retaliatory mindset and thus cannot form the basis of a retaliatory hostile work environment claim. *See e.g., Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (noting that Plaintiffs may satisfy causality by showing "the employer had knowledge of the employee's protected activity, and…the adverse personnel action took place shortly *after* that activity.") (emphasis added) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)). This further weakens any claim that Plaintiff was subjected to a retaliatory hostile work environment.

working conditions. For this reason, summary judgment is awarded as to the hostile work environment claim.

### D. Breach of Contract and/or Promissory Estoppel

Lastly, Plaintiff alleges that Defendant breached "its contract to Plaintiff by its failure to follow its own [EEO] policies, practices and procedures and its failure to provide a hostile free work environment" even though the Defendant "promulgated express and written statements of Equal Employment Opportunity…" Pl.'s Am. Compl. ¶22, 24. In relevant part, KPMG's EEO policy prohibits discrimination and workplace harassment on the basis of race and national origin. EEO Policy, Def.'s Mot. Summ. J., Ex. O. It also encourages employees to report any discriminatory issues to Human Resources without fear of retaliation. *Id.* Under D.C. law, a claim for a breach of contract includes four elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

In order to be considered valid, a contract must be based on mutual consideration. *Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009). "An exchange of promises provides sufficient consideration, evidencing mutual obligation." *Id.* (citing *EastBanc, Inc. v. Georgetown*, 940 A.2d 996, 1003 (D.C. 2008)). "Mutuality exists when each party agrees to do something it otherwise is under no legal obligation to do, or to refrain from doing something it has a legal right to do." *Id.; see also Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C.1976). Under the principle of mutuality, KPMG's EEO Policy cannot constitute an enforceable contract. In promising to provide an equal opportunity for all employees regardless of race, sex, or national origin, KPMG is promising to do no more than it is already required to do under the law. After all, that is the basis for Plaintiff's entire lawsuit. For this simple reason, the EEO policy is not

one based in mutuality and thus does not have the requisite consideration to constitute a valid contract. Moreover , although Plaintiff signed the policy statement acknowledging that she received and understood it, the policy statement likewise does not independently impose any obligations on her.

Regardless of whether the EEO policy provides an enforceable contract upon which the Plaintiff can sue, Plaintiff has not provided sufficient evidence that the Defendant breached its EEO policy by discriminating against Plaintiff on the basis of race or national origin. As already analyzed above, Plaintiff's evidence of discriminatory intent in termination is sparse and relies on second hand testimonials by family, or self-serving, conclusory, and uncorroborated testimony in her own deposition. Such evidence is insufficient to convince a reasonable jury that Plaintiff was harassed or terminated due to her race or national origin.  Neither KPMG's internal investigation nor the discovery process unearthed a single employee in the firm who could corroborate Plaintiff's claim of discrimination. This is despite Plaintiff's assertion that KPMG's racial discrimination is a fact often recognized and discussed among the employees. Dep. Ajisefinni, 156-7.

Because KPMG's EEO policy does not constitute an enforceable contract, and because Plaintiff has not set forth sufficient evidence for a reasonable jury to conclude that the Defendant breached any agreement by terminating her, summary judgment is awarded as to the breach of contract claim.

## V.  CONCLUSION

For the foregoing reasons, the Court grants summary judgment to the Defendant on all claims.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 12, 2014                                                    RUDOLPH CONTRERAS
United States District Judge